UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CANDICE RICHARDSON,

                         Plaintiff,

v.                                                 5:15-CV-0360
                                                   (GTS/WBC)
COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.

_____

APPEARANCES:                                       OF COUNSEL:

BOND, MCDONALD LAW FIRM                             MARK M. MCDONALD, ESQ.
  Counsel for Plaintiff
91 Genesee St.
Geneva, NY 14456

U.S. SOCIAL SECURITY ADMIN.                         JOANNE PENGELLY, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
  Counsel for Defendant
26 Federal Plaza – Room 3904
New York, NY 10278

William B. Mitchell Carter, U.S. Magistrate Judge,

## <u>REPORT and RECOMMENDATION</u>

        This matter was referred for report and recommendation by the Honorable Judge

Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local

Rule 72.3(d).  (Dkt. No. 24.)  This case has proceeded in accordance with General

Order 18.

        Currently before the Court, in this Social Security action filed by Candice

Richardson ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the

Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-

motions for judgment on the pleadings. (Dkt. Nos. 17, 23.) For the reasons set forth below, it is recommended that Plaintiff's motion be denied and Defendant's motion be granted.

## I.    RELEVANT BACKGROUND

### A.    Factual Background

Plaintiff was born on August 17, 1991. (T. 114.) She completed the 10th grade. (T. 134.) Generally, Plaintiff's alleged disability consists of depression, anxiety, mood disorder, diabetes, and high blood pressure. (T. 133.) Her alleged disability onset date is January 1, 2008. (T. 47.) She has no past relevant work.

### B.    Procedural History

On June 8, 2011, Plaintiff applied for Supplemental Security Income ("SSI") under Title XVI, of the Social Security Act. (T. 47.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On May 29, 2013, Plaintiff appeared before the ALJ, Scott M. Staller. (T. 24-45.) On July 25, 2013, ALJ Staller issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 7-23.) On February 11, 2015, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-4.) Thereafter, Plaintiff timely sought judicial review in this Court.

### C.    The ALJ's Decision

Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 12-19.) First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 8, 2011. (T. 12.) Second, the ALJ found that

Plaintiff had the severe impairments of major depressive disorder, post-traumatic stress disorder ("PTSD"), and panic disorder with agoraphobia. (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 12-13.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels. (T. 14.) The ALJ found that Plaintiff had additional non-exertional limitations and that Plaintiff could:

> understand, remember, and carry out simple instructions as well as make judgments on simple work related decisions. She would need a low stress job defined as having only occasional decision-making and only occasional changes in the work setting. [Plaintiff] should have only brief, infrequent, and superficial contact with the public and only occasional contact with coworkers and/or supervisors. [Plaintiff] would be able to maintain attention and concentration for two-hour segments over an eight-hour period and complete a normal workweek without excessive interruptions from psychologically or physically based symptoms.

(*Id.*) Fifth, the ALJ determined that Plaintiff had no past relevant work and there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 17-18.)

## II.    THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A.    Plaintiff's Arguments

Plaintiff makes two separate arguments in support of her motion for judgment on the pleadings. First, Plaintiff argues the ALJ improperly assessed the opinion evidence and arrived at an improper RFC. (Dkt. No. 17 at 17-27 [Pl.'s Mem. of Law].) Second, and lastly, Plaintiff argues the ALJ improperly assessed Plaintiff's credibility. (*Id.* at 27-30.)

### B.    Defendant's Arguments

In response, Defendant makes two arguments.  First, Defendant argues the ALJ properly assessed Plaintiff's RFC.  (Dkt. No. 23 at 4-14 [Def.'s Mem. of Law].)  Second, and lastly, Defendant argues the ALJ properly assessed Plaintiff's credibility.  (*Id.* at 14-17.)

## III.    RELEVANT LEGAL STANDARD

### A.    Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971).  Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

## B.  Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted

with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

## IV.   ANALYSIS

### A.   Assessment of Medical Evidence in the Record and RFC Determination

Plaintiff argues the ALJ incorrectly assessed the medical opinion evidence in the record, thus rendering her RFC determination faulty. (Dkt. No. 17 at 17-27 [Pl.'s Mem. of Law].)   Plaintiff asserts that the ALJ incorrectly afforded "significant weight" to consultative examiners, Christina Caldwell, Psy.D. and Tanya Perkins-Mwantuali, M.D., and to the non-examining State agency medical consultant, R. Altmansberger, over Plaintiff's treating nurse practitioner, Linda Sillars. (*Id.* at 17.)   For the reasons set forth below, the ALJ's decision to afford "little weight" to Nurse Sillars was made in accordance with the Regulations and supported by substantial evidence. Further, the ALJ's overall RFC determination was supported by substantial evidence in the record.

Plaintiff's RFC is the most she can still do despite her limitations. *See* 20 C.F.R. § 416.945.   In making an RFC determination, the ALJ must base his decision on all of the relevant medical and other evidence in the record. *Id.* at § 416.945(a)(3).

The relevant factors considered in determining what weight to afford a medical opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a

whole, and the specialization (if any) of the opinion's source.  20 C.F.R. § 416.927(c)(1)-(6).

The opinion of a treating source will be given controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2).

The following factors must be considered by the ALJ when deciding how much weight the opinion should receive, even if the treating source is not given controlling weight: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  20 C.F.R. § 416.927(c)(2)(i)-(iv).  The ALJ is required to set forth his reasons for the weight he assigns to the treating physician's opinion. *Id.*, *see also* SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir.1998)).

Although a nurse practitioner may be a treating health care provider, not all treating health care providers are "treating sources" under the applicable Social Security Regulations.  A "treating source" is defined as the plaintiff's "own physician, psychologist, or other acceptable medical source who provides [plaintiff], or has provided [plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [plaintiff]."  20 C.F.R. § 416.902.  There are five categories of "acceptable medical sources."  *Id.* at § 416.913(a).  Nurse practitioners are not included within those categories.  Nurse practitioners are listed among the "other

medical sources," whose opinion may be considered as to the severity of a plaintiff's impairment and ability to work, but their conclusions are not entitled to any special weight. *Id.* at § 416.913(d)(1).

The Second Circuit has held that a nurse practitioner's opinion was entitled to some consideration, "particularly because [the nurse practitioner] was the only medical professional available to [plaintiff] for long stretches of time in the very rural 'North Country' of New York State." *Kohler v. Astrue,* 546 F.3d 260, 268–69 (2d Cir. 2008).[1] Courts have also held that an ALJ is not required to weigh the assessment of an "other medical source" at all. *Ross v. Colvin*, No. 6:13-CV-00755, 2014 WL 5410327, at *16 (N.D.N.Y. Oct. 21, 2014); *see Bulavinetz v. Astrue,* 663 F.Supp.2d 208, 212 (W.D.N.Y.2009); *see Esteves v. Barnhart,* 492 F.Supp.2d 275, 281-282 (W.D.N.Y.2007) (ALJ is under no obligation to weigh a mental health counselor's assessment in determining whether a plaintiff is disabled). Here, the ALJ did address, and afford weight, to Nurse Sillars's opinions.

Nurse Sillars completed five functional assessment forms on behalf of Plaintiff. On June 5, 2012, she completed an "Evaluation of the [RFC] of the Mentally Impaired Patient" form. (T. 252-255.)[2] At that time, Nurse Sillars opined that Plaintiff's ability to comprehend and carry out simple instructions was fair; her ability to remember work procedures was fair; and her ability to remember detailed instructions was poor. (T. 252-253.) She opined Plaintiff's ability to respond appropriately to supervision was

[1] Unlike the plaintiff in *Kohler*, Plaintiff was not located in the very rural North Country of New York with limited access to medical care. (T. 115.)

[2] The form defined the following terms: "unlimited" – the ability to function in this area is more than satisfactory, "good" – the ability to function in this area is limited but satisfactory, "fair" – the ability to function in this area is seriously limited and will result in periods of unsatisfactory performance at unpredictable times and "poor" – no useful ability to function in this area. (T. 252.)

poor.  (T. 253.)  Nurse Sillars opined Plaintiff's ability to function independently on a job was fair; her ability to complete a normal workday on a sustained basis was poor; her ability to exercise appropriate judgment was poor; and her ability to concentrate and attend to a task over an eight-hour period was poor.  (*Id.*)  Nurse Sillars stated Plaintiff's ability to abide by occupational rules and regulations was fair and her ability to make simple work-related decisions was poor.  (T. 254.)  She opined Plaintiff's ability to maintain social functioning was good, as was her ability to be aware of normal hazards and make necessary adjustments to avoid those hazards.  (*Id.*)  She opined Plaintiff had no evidence of limitations in her ability to maintain basic standards of personal hygiene and grooming.  (*Id.*)  Nurse Sillars opined Plaintiff's ability to tolerate customary work pressures in a work setting was poor.  (*Id.*)

Nurse Sillars also completed multiple employment assessment forms for the New York State Office of Temporary and Disability Assistance.  (T. 417-426.)[3]  In December of 2010, Nurse Sillars stated Plaintiff was "very limited" in her ability to: interact appropriately with others and maintain socially appropriate behavior without exhibiting behavior extremes.  (T. 418.)  Nurse Sillars opined Plaintiff was "moderately limited" in her ability to: carry out instructions; maintain attention and concentration; and function in a work setting at a consistent pace.  (*Id.*)  Nurse Sillars stated that Plaintiff had "extreme symptoms" and "even if she [was] stable on meds, she [would] need to learn to manage stress."  (T. 418.)  On March 21, 2011, Nurse Sillars completed another employment assessment form.  (T. 419-420.)  Therein she opined Plaintiff had the same functional limitations as in the December 2010 assessment.  (T. 418, 420.)

---

[3]      Regarding functional limitations, the form offers three options: "no evidence of limitations," "moderately limited," and "very limited."  (T. 418.)  The forms do not provide further definitions.

On September 23, 2011, Nurse Sillars completed another employment assessment form. (T. 421-422.) Nurse Sillars indicated that her last examination of Plaintiff occurred on March 25, 2011. (T. 422.) Therein she opined Plaintiff had "no evidence of limitations" in her ability to: understand and remember instructions; carry out instructions; maintain attention/concentration; make simple decisions; and maintain basic standards of personal hygiene and grooming. (*Id*.) Nurse Sillars opined Plaintiff was "moderately limited" in her ability to: interact appropriately with others and maintain socially appropriate behavior without exhibiting behavior extremes. (*Id*.) She opined Plaintiff was "very limited" in her ability to function in a work setting at a consistent pace. (*Id*.)

On March 23, 2012, Nurse Sillars opined Plaintiff was "very limited" in all areas of functioning, except she was "moderately limited" in her ability to maintain basic standards of personal hygiene and grooming. (T. 424.)

The ALJ afforded "little weight" to Nurse Sillars's medical source statements. (T. 17.) The ALJ reasoned the limitations were not supported by objective clinical findings, including Nurse Sillars's own mental status examinations. (*Id*.)

Although Nurse Sillars had an extensive treatment history with Plaintiff, her treatment relationship was only one factor to be used in the overall evaluation of her medical opinion. *See* 20 C.F.R. § 416.927(c). Despite her treatment history with Plaintiff, the other factors in the Regulations do not weigh in her favor. As stated by the ALJ, Nurse Sillars's opinions regarding Plaintiff's functional limitations were inconsistent with other evidence in the record, including her own objective clinical observations.

Nurse Sillars's functional limitations outlined in her December 2010 assessment form were inconsistent with her treatment notations and observations at that time. In December of 2010, Plaintiff reported that her mood was "better" and her anxiety "less." (T. 299.) Plaintiff reported that she still yells "at times," but "has learned to walk away." (*Id.*) Nurse Sillars noted that Plaintiff was "doing well" on her current medication. (*Id.*) Plaintiff's mental status examination at the time was normal. (*Id.*) Nurse Sillars noted Plaintiff's appearance was appropriate; her attitude was interactive, pleasant, cooperative, with good eye contact; her mood was euthymic, appropriate and stable; her appetite and sleep were intact; her speech was spontaneous, non-pressured, and coherent; her though process was logical and organized; she had no hallucinations, no delusions, and no paranoia; her cognitive functioning was intact; her impulse control was stable; and her insight and judgment were intact. (*Id.*)

On March 11, 2011, Plaintiff met with Nurse Sillars and again, treatment notations were inconsistent with the functional limitations assessed in the March 21, 2011 form. On March 11, 2011, Nurse Sillars observed that Plaintiff's appearance was appropriate; her attitude/behavior was interactive, pleasant, cooperative, with good eye contact; her mood was irritable; her speech was spontaneous, non-pressured, and coherent; her thought process was logical and organized; she heard voices "after meds wear off;" she felt "aggressive;" her cognitive functioning was intact; her impulse control was stable; and her insight and judgment were intact. (T. 311.) Nurse Sillars noted during this appointment that Plaintiff reported her medications wore off in the evening and Nurse Sillars altered Plaintiff's medication. (*Id.*) At her March 25, 2011

appointment, Plaintiff informed Nurse Sillars that she was pregnant and all medication was ceased.  (T. 315.)

Nurse Sillars did not treat Plaintiff between March 25, 2011 and December 2, 2011.  (T. 422, 360.)[4]  However, during that period of time Plaintiff continued to receive counseling from Fay Meling, LCSW-R.  On April 4, 2011, Ms. Meling noted Plaintiff was off her medications due to her pregnancy.  (T. 317.)  Plaintiff reported the voices were "no worse," she was "more irritable and agitated," but her impulse control was better. (*Id.*)  Ms. Meling noted Plaintiff's progress was improved.  (*Id.*)  On May 16, 2011, Plaintiff met with Ms. Meling.  (T. 322.)  Plaintiff reported that she was not taking any medication and the voices were getting stronger and she felt "close to losing control." (*Id.*)  Ms. Meling noted Plaintiff's progress was "significantly worse."  (*Id.*)  Ms. Meling noted on June 6, 2011 that she spoke to Plaintiff on the phone and Plaintiff indicated she has "been better."  (T. 326.)  Plaintiff reported that she had "random rages" and she was able to resist the voices in her head.  (*Id.*)  Ms. Meling noted Plaintiff cancelled her appointment due to illness and reported that "things haven't been too bad recently." (*Id.*)  Ms. Meling noted on June 20, 2011 that Plaintiff cancelled her appointment due to not feeling well, that her case manager was "trying to get her on SSI," and she was angry a lot.  (T. 329.)  Plaintiff again cancelled her appointment on June 27, 2011, but reported to Ms. Meling on the telephone that she was able to maintain control.  (T. 330.)

Plaintiff met with Ms. Meling on July 11, 2011.  (T. 332.)  Ms. Meling noted Plaintiff was wearing makeup and in a good mood.  (*Id.*)  Plaintiff reported that her mood

---

[4]         The record contains a two page Psychiatric Progress Note from Nurse Sillars which appears to be dated 10/27/11 on the first page and 10/28/10 on the second page.  (T. 349-350.)  Based on a reading of the record as a whole, Plaintiff did not receive medication management from Nurse Sillars in October of 2011 due to Plaintiff's pregnancy and this form was completed in October of 2010.

was like "a roller coaster" and she hears voices when she's angry.  (*Id.*)  Ms. Meling

noted Plaintiff's progress was improved.  (*Id.*)  On August 8, 2011, Plaintiff reported that

she continued to have angry outbursts.  (T. 340.)  Ms. Meling noted Plaintiff's progress

as improved.  (*Id.*)  On September 19, 2011, Plaintiff reported to Ms. Meling that she

"misses her medication," she also reported she was able to manage her thoughts.  (T.

343.)  Ms. Meling noted her progress as improved.  (*Id.*)

Plaintiff resumed treatment with Nurse Sillars in December of 2011 after the birth

of her daughter.  (T. 360.)  At that time, Plaintiff resumed taking Abilify, Zoloft, and

Klonopin.  (*Id.*)  Nurse Sillars's mental status examination at that time was normal;

however, she noted Plaintiff reported the voices were "very quiet."  (*Id.*)  Plaintiff

reported at the end of December 2011 that her medications were not working and that

she woke up angry and depressed.  (T. 367.)  On January 20, 2012, Nurse Sillars

increased Plaintiff's medication dosage.  (T. 370.)  Nurse Sillars observed that Plaintiff's

appearance was appropriate; her attitude/behavior was interactive, pleasant,

cooperative and with good eye contact; she was sad and angry; she was sleeping a lot;

her speech was spontaneous, non-pressured, and coherent; her thought process was

logical; she heard voices constantly; her impulse control was stable; and her insight and

judgment were intact.  (*Id.*)

In February of 2012, Nurse Sillars noted Plaintiff complained of anger and

exploding for "no reason."  (T. 374.)  Nurse Sillars increased Plaintiff's dosage of Abilify

and prescribed Seroquel.  (*Id.*)  Nurse Sillars's mental examination indicated Plaintiff

was upset, irritable and depressed; otherwise, the examination was normal.  (T. 374.)

Nurse Sillars's functional restrictions outlined in her March 2012 employment assessment form were inconsistent with her own treatment observations in March of 2012. On March 8, 2012, Nurse Sillars noted that Plaintiff was "doing much better" on an increased dosage of Abilify and that Zoloft helped her depression. (T. 378.) At that time, Plaintiff reported to Nurse Sillars that her anger was "much less" with medication, but that medication was not working for her panic attacks. (*Id.*) Plaintiff reported that she enjoyed being a mom and had fewer arguments with her husband on an increased dosage of Ability. (*Id.*) Further, a mental status examination at that time was normal. Plaintiff's appearance was noted as appropriate; she was interactive, pleasant, cooperative, and made good eye contact; her speech was spontaneous, non-pressured and coherent; her thought process was logical; her impulse control was stable; and her insight and judgment were intact. (*Id.*) Nurse Sillars noted that Plaintiff did not hear voices on Abilify. (*Id.*) Nurse Sillars's notations from her March 8, 2012 session were inconsistent with her March 23, 2012 assessment form in which she indicated Plaintiff was "very limited" in almost every area of functioning. (T. 424.)

Nurse Sillars's opinions were not only inconsistent with her clinical observations, they were also inconsistent with other opinion evidence in the record, such as the opinions of nurse practitioner Sandra Zambello and consultative examiner, Dr. Caldwell.

In January of 2013 Plaintiff's treating nurse practitioner, Sandra Zambello, completed an employment assessment form. (T. 426-427.) Therein, she opined that Plaintiff had "no evidence of limitations" in her ability to: understand and remember instructions; carry out instructions; make simple decisions; and maintain basic standards of personal hygiene and grooming. (T. 427.) Nurse Zambello opined that

Plaintiff was "moderately limited" in her ability to: maintain attention/concentration; interact appropriately with others; maintain socially appropriate behavior without exhibiting behavior extremes; and function in a work setting at a consistent pace. (*Id.*)

Nurse Zambello's mental status examination on November 1, 2012, stated Plaintiff's affect was appropriate, her mood was euthymic, and she presented herself in an appropriate fashion. (T. 407.) Nurse Zambello observed Plaintiff had good eye-contact; her speech was logical, coherent, and goal-directed; her recent and remote memory was not impaired; there was a negligible degree of conceptual disorganization; her attitude was cooperative and interested; her attention and concentration was characterized as able "to attend and maintain focus;" and Plaintiff was reflective and able to resist urges. (*Id.*)

On December 14, 2012, Plaintiff reported feeling angry and "crying a lot." (T. 409.) Nurse Zambello again noted a normal mental status examination. Specifically, Plaintiff was appropriate; she had good eye-contact; her memory was intact; she was cooperative and interested; her judgment was good; her attention and concentration were good; and she was reflective and able to resist urges. (T. 409-410.) In January of 2013 Plaintiff reported medications were working, but requested Klonopin for her anxiety as it worked for her in the past and also reported Klonopin helped with her anger. (T. 411.) Nurse Zambello's January 4, 2013 mental status exam contained the same observations as her examinations in November 2012 and December 2012. (T. 411-412.)

Dr. Caldwell performed a consultative examination on September 22, 2011. (T. 256-260.) On examination, Dr. Caldwell noted Plaintiff was cooperative, and her

manner of relating, social skills, and expressive and receptive language was adequate. (T. 258.)  Dr. Caldwell observed Plaintiff was oriented, and her attention, concentration, memory, and cognitive functioning were intact.  (T. 258-259.)  Dr. Caldwell provided specific functional limitations for Plaintiff in a medical source statement.  Dr. Caldwell opined that Plaintiff was able to follow and understand simple directions and instructions, able to perform simple tasks independently, able to maintain attention and concentration, able to maintain a regular schedule, able to learn new tasks, and able to perform complex tasks independently.  (T. 259.)  Dr. Caldwell opined Plaintiff would be limited in her ability to make appropriate decisions, relate adequately with others, and appropriately deal with stress.  (*Id.*)

To be sure, Plaintiff provides evidence from the record that supports her assertion that she had greater limitations than those imposed by the ALJ in his RFC determination.  (Dkt. No. 17 at 17-27 [Pl.'s Mem. of Law].)  However, it is not enough for Plaintiff to disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support her position.  Plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in record.  *See Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Wojciechowski v. Colvin,* 967 F.Supp.2d 602, 605 (N.D.N.Y. 2013) (Commissioner's findings must be sustained if supported by substantial evidence even if substantial evidence supported the plaintiff's position); *see also Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991) (reviewing courts must afford the Commissioner's determination considerable deference and cannot substitute own judgment even if it might justifiably have reached a different result upon a *de novo* review).

Overall, there is substantial evidence in the record to support the ALJ's conclusion to afford Nurse Sillars's opinion "little weight."  Further, the ALJ properly followed the Regulations in affording Nurse Sillars's opinion weight.   As stated herein, and as outlined by the ALJ in his decision, Nurse Sillars's opinions regarding Plaintiff's mental limitations were inconsistent with her own treatment notations and other treatment notations in the record.

The ALJ's RFC determination was supported by the medical opinion evidence supplied by the non-examining State agency consultant, Dr. Altmansberger and Dr. Caldwell.  (T. 237-250, 428-431, 257-260.)

Dr. Altmansberger concluded that after reviewing the medical evidence in the record as of November 2011, Plaintiff had moderate limitations in: understanding and concentrating basic instructions; carrying out detailed instructions; performing activities within a schedule and maintaining regular attendance and punctuality; working in coordination with others; completing a normal workweek and performing at a consistent pace; interacting appropriately with the general public and co-workers; accepting instructions and responding to criticism from supervisors; responding to changes in a work setting; and traveling in unfamiliar places.  (T. 429.)  Dr. Altmansberger further concluded Plaintiff was not significantly limited in her ability to: remember locations and work-like procedures; understand, remember and carry out simple instructions; maintain attention and concentration for extended periods; and sustain an ordinary routine without special supervision, among other areas.  (T. 428.)

The ALJ afforded "significant weight" to the opinions of Dr. Altmansberger and Dr. Caldwell.  (T. 16.)  Plaintiff argues the ALJ erred in his reliance on the opinion of Dr.

Altmansberger because Dr. Altmansberger relied on the disability analyst's conclusions and he provided no specific consideration to any medical source examination other than Dr. Caldwell. (Dkt. No. 17 at 22 [Pl.'s Mem. of Law].) First, it is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 416.912(b)(6), 416.913(c), and 416.927(e); *see also Leach ex. Rel. Murray v. Barnhart,* No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y.Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.").

Here, Dr. Altmansberger provided a complete explanation for his determination on his assessment form. (T. 430.) Dr. Altmansberger relied on Dr. Caldwell's report and treatment notations in the record at the time. (*Id.*) He specifically cited treatment notations from July 22, 2010 in which Plaintiff reported that she did not have auditory hallucinations and that the voices in her head were her own voice, just in different moods. (*Id.*)

In addition, although the ALJ relied, in part, on the opinion of Dr. Altmansberger in formulating his RFC determination, the ALJ also relied on the medical opinion evidence of Dr. Caldwell and Plaintiff's treating mental health providers. The ALJ did not provide Nurse Sillars's medical source opinions great weight; however, he did take into consideration her mental status examinations and other treatment notations in formulating his RFC. The ALJ further relied on Nurse Zambello's opinion, and treatment notations. Therefore, the ALJ's RFC determination was supported by substantial

evidence based on the opinions of Dr. Caldwell, Dr. Altmansberger, Nurse Zambello and, to a lesser extent, Nurse Sillars.

Plaintiff argues the ALJ substituted his own judgment in evaluating the medical opinion evidence in the record. (Dkt. No. 17 at 21 [Pl.'s Mem. of Law].) To be sure, ALJ are entitled to resolve conflicts in the record, but their discretion is not so wide as to permit them to pick and choose only evidence that supports a particular conclusion. *See Smith v. Bowen,* 687 F.Supp. 902, 904 (S.D.N.Y.1988) (citing *Fiorello v. Heckler,* 725 F.2d 174, 175–76 (2d Cir.1983)); *see also Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir.2011); *Robinson v. Barnhart,* 366 F.3d 1078, 1083 (10th Cir.2004). However, a complete review of the ALJ's decision and the record failed to indicate that the ALJ substituted his own lay interpretation of the medical evidence in question. The ALJ thoroughly outlined all the medical opinion evidence in the record and provided good reason for the weight afforded to that evidence.

Plaintiff argues the ALJ erred in his reliance on Plaintiff's global assessment of functioning ("GAF") scores, which indicated moderate mental health symptoms or deficits in functioning. (Dkt. No. 17 at 24-25 [Pl.'s Mem. of Law].) To be sure, a GAF score is not dispositive of disability, and are but one factor to be considered in the disability analysis. *Dowd v. Comm'r of Soc. Sec.*, No. 12-CV-6244, 2013 WL 3475479, at *13n.18 (W.D.N.Y. July 10, 2013). Here, the ALJ did not rely solely on Plaintiff's GAF scores in formulating the RFC determination or in discounting the opinions of mental health providers, instead the ALJ properly referenced Plaintiff's GAF scores as one piece in his overall RFC analysis. (T. 15-16.)

Plaintiff argues the ALJ erred in misreading medical evidence in the record. (Dkt. No. 17 at 26-27 [Pl.'s Mem. of Law].) In his decision, the ALJ stated Dr. Perkins-Mwantuali "performed a psychiatric examination of [Plaintiff] with almost identical findings and limitations" as noted in Dr. Caldwell's opinion. (T. 15.) The ALJ cited to "Exhibit 3F/5-7." (*Id.*) Exhibit 3F contained Dr. Perkins-Mwantuali's physical examination (T. 229-232), but it also contained a copy of Dr. Caldwell's psychiatric examination at pages five through seven (T. 233-236). The ALJ erred in his reading of the exhibits contained in 3F; however, any error in the ALJ's misidentification of Dr. Perkins-Mwantuali's examination was harmless.

Administrative legal error is harmless when the same result would have been reached had the error not occurred. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."). Although the ALJ relied on his incorrect belief that Dr. Perkins-Mwantulai performed a mental examination which yielded the same results as Dr. Caldwell, the ALJ appeared to use this evidence as one factor to bolster Dr. Caldwell's opinion. (T. 15.)

The ALJ afforded Dr. Caldwell's opinion "significant weight" because she was an expert in the Social Security disability program, she personally observed the Plaintiff, and her findings were consistent with her examination and other opinion evidence in the record. (T. 16.) Had the ALJ correctly noted that Dr. Caldwell's opinion was reproduced in duplicate in the exhibit containing Dr. Perkins-Mwantulai's opinion and not a separate opinion, that would not have changed the ALJ's reasoning that Dr. Caldwell's opinion was supported by the fact that she treated Plaintiff, and her opinion

was supported by her treatment observations, and other opinion evidence in the record. Absent his error, the ALJ would have come to the same conclusion regarding Plaintiff's RFC because the RFC would nonetheless be supported by the medical opinion evidence of Drs. Caldwell and Altmansberger, to whom the ALJ afforded "significant weight" and the opinions of Nurses Zambello and Sillars, to whom the ALJ afforded "some" and "little" weight respectively. (T. 16-17.)

Overall, in making an RFC determination, the ALJ properly analyzed and weighed the medical opinion evidence in the record. The ALJ provided a thorough synopsis of the medical evidence in the record and clearly adhered to the Regulations in weighing the opinion evidence. The ALJ's RFC determination was supported by substantial evidence in the record, which is "more than a mere scintilla . . . [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran,* 569 F.3d 108, 112 (2d Cir.2009). Although Plaintiff cited evidence in the record which could support her assertion that her limitations were greater than those in the RFC, there was also substantial evidence which could reasonably be accepted as adequate to support the ALJ's conclusion, specifically the opinions of Dr. Caldwell and Dr. Altmansberger. Further, in evaluating whether substantial evidence supports a disability determination, "we defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012). Accordingly, this Court "may not substitute [our] own judgment for that of the [Commissioner], even if [we] might justifiably have reached a different result upon a *de novo* review." *Valente,* 733 F.2d at 1041.

**B.     The ALJ's Credibility Determination**

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (*quoting Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

"The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*, at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id., see* 20 C.F.R. § 416.929(c)(3)(i)-(vii).  Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (citing *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)).

Here, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms was not entirely credible.  (T. 15.)

Plaintiff first argues the ALJ improperly inferred from her activities of daily living that she could perform a full day's work on a sustained basis.  (Dkt. No. 17 at 28 [Pl.'s Mem. of Law].)

To be sure, "the mere fact that [a plaintiff] is mobile and able to engage in some light tasks at [her] home does not alone establish that [s]he is able to engage in substantial gainful activity."  *Lecler v. Barnhart,* 2002 WL 31548600, at *7 (S.D.N.Y. Nov. 14, 2002) (quoting *Gold v. Sec'y of Health, Ed. & Welfare,* 463 F.2d 38, 41 n. 6 (2d Cir.1972)).  Indeed, "[s]uch activities do not by themselves contradict allegations of disability," as people should not be penalized for enduring the pain of their disability in order to care for themselves [or their children]."  *Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000); *see also Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act.")  However, under the Regulations, a plaintiff's

activities of daily living are a factor to be considered in making a credibility determination.

Courts have held that in making a credibility determination an ALJ correctly noted a plaintiff was able to care for his child "including changing diapers, that he sometimes vacuumed and washed dishes, that he occasionally drove, and that he watched television, read, and used the computer." *Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) ("The ALJ also relied on Cichocki's Daily Activities Questionnaire on which she indicated that she performed numerous daily tasks, such as walking her dogs and cleaning her house, that are consistent with a residual capacity to perform light work.").

Here, at step two, the ALJ cited evidence of Plaintiff's activities of daily living, such as cooking, attending to personal hygiene, performing childcare and household chores, which the ALJ reasoned contradicted her claims about greater mental health related limitations in that area. (T. 12.) The ALJ outlined Plaintiff's testimony regarding the limiting effects of her symptoms, such as difficulty keeping her thoughts organized and getting along with others. (T. 14.) The ALJ properly relied on Plaintiff's testimony and activities of daily living as one factor in making his credibility determination. Ultimately, the ALJ did not conclude that Plaintiff was not disabled based on her activities of daily living, but rather that her statements regarding the limiting effects of her mental health impairments on her activities of daily living were not credible. In making his credibility determination the ALJ also relied on mental health examinations and other objective medical evidence in the record. (T. 15-17.)

Plaintiff next argues the ALJ failed to consider the affidavit supplied by Plaintiff's

mother. (Dkt. No. 17 at 29 [Pl.'s Mem. of Law].) Plaintiff's mother submitted an affidavit

in which she described her observations of Plaintiff's "disability" and how her "disability"

effected Plaintiff's ability to perform daily activities; to understand, remember and carry

out instructions; to respond appropriately to others; to exercise judgment and make

decisions; to maintain continuous performance to complete a task; and to tolerate stress

and work pressure. (T. 262-263.) The affidavit also provided a general opinion as to

Plaintiff's ability to work. (T. 263.)

Here, the ALJ completed his credibility analysis without mentioning the affidavit

by Plaintiff's mother. Despite not mentioning the affidavit specifically, the ALJ did state

in his decision that he took into account "all the evidence" and further that he gave

consideration to the opinion evidence in accordance with 20 C.F.R. § 416.927 and

SSRs 96-2p, 96-5p, and 06-3p. (T. 10, 14.) "An ALJ is not required to discuss in depth

every piece of evidence contained in the record, so long [as] the evidence of record

permits the Court to glean the rationale of an ALJ's decision." *LaRock ex. rel. M.K. v.*

*Astrue,* No. 10–CV–1019, 2011 WL 1882292, *7 (N.D.N.Y. Apr. 29, 2011) (citing

*Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983) (internal quotation marks

omitted)). In his credibility analysis, the ALJ acknowledged the consistency of Plaintiff's

reported symptoms. (T. 15.) However, the ALJ concluded that despite the consistency

of her complaints, her mental status examinations indicated "relatively normal

functioning." (*Id.*) The ALJ then provided specific examples from the record to support

his conclusion. (T. 16.) The ALJ also considered Plaintiff's treatment and medication

and their effects on her mental impairments. (*Id.*) The mother's statements certainly

mirrored Plaintiff's reported symptoms, but the ALJ ultimately concluded that although Plaintiff's impairments could reasonably cause her symptoms, the limiting effect of her symptoms was not as severe as alleged based on the objective medical evidence and Plaintiff's testimony including her activities of daily living.  (T. 15.)  The ALJ provided a thorough credibility analysis.  The ALJ stated he took into consideration all the evidence in the record and any error in mentioning the mother's affidavit was harmless, because the ALJ's rationale can be easily gleaned from his decision.  Therefore, for the reasons stated herein, and in Defendant's brief, it is recommended that the Commissioner's decision be affirmed.

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:     April 11, 2016

_____
William B. Mitchell Carter
U.S. Magistrate Judge